UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:16-CV-00004-TBR

JEFFERY R. TAYLOR,                                              PLAINTIFF

v.

G.P.E.D.C., INC. d/b/a
PADUCAH ECONOMIC DEVELOPMENT,                                  DEFENDANT

and

G.P.E.D.C., INC. d/b/a
PADUCAH ECONOMIC DEVELOPMENT,                        THIRD-PARTY PLAINTIFF

v.

LOGAN DEVELOPMENT GROUP, LLC,                        THIRD-PARTY DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant GPEDC's Motion for Summary Judgment,

[DN 29.] Plaintiff Jeffery R. Taylor responded, [DN 31], as did Third-Party Defendant Logan

Development Group, [DN 32.] Defendant replied to both responses, [DN 33; DN 35.] Defendant

also filed a Motion for Leave to Amend Third Party Complaint, [DN 34], to which Third-Party

Defendant Logan responded, [DN 36], and Defendant replied, [DN 37.] Fully briefed, these

matters are ripe for adjudication. For the reasons that follow, Defendant's Motion for Summary

Judgment, [DN 29], is **GRANTED IN PART AND DENIED IN PART** and Defendant's

Motion for Leave to Amend Third Party Complaint, [DN 34], is **GRANTED**.

BACKGROUND

This matter arises out of Plaintiff Jeffrey R. Taylor's application for the position of Vice

President for Special Projects at Defendant GPEDC d/b/a Paducah Economic Development

("GPEDC"). Taylor is a 57-year-old African-American male who has been a resident of Hopkinsville, Kentucky, for the past twenty-two years. [*See* DN 1 (Complaint); DN 50-3 at 5–6 (Taylor Deposition).] He holds a bachelor's of science degree in communication from Western Kentucky University and a master's of arts degree in community counseling from University of North Alabama. [DN 31-5 at 32 (Taylor Resume).] In 1994, he obtained a certification in Basic Economic Development from the Georgia Institute of Technology, and thereafter spent two years at the Economic Development Institute at the University of Oklahoma. [*Id.*] Finally, Taylor is certified as an Economic Development Finance Professional by the National Development Council. [*Id.*]

From 1981 to September 2014, Taylor was employed at the Tennessee Valley Authority (TVA), where he held multiple positions and had numerous responsibilities. [*Id.*] Taylor held the position of Project Manager from May 1981 to August 2003, the position of Project Manager Minority Economic Development from May 2000 to August 2003, and the Position of Senior Project Manager of Economic Development from August 2003 to September 2014. [*Id.*] Among his responsibilities concerning economic development were working with elected officials and economic development partners, managing loan funds, technical assistance, and grant programs, coordinating with communities, and generating industrial projects. [*See id.*; *see* DN 50-3 at 26–45.] Taylor retired from TVA in September 2014. [DN 50-3 at 48.]

GPEDC is a private, non-profit corporation that was incorporated in 1990. [DN 29-7 at 3 (Articles of Incorporation).] GPEDC's stated purpose "is to develop and market property," and it can "also own, sell, and lease real and personal property." [*Id.*] During his deposition, GPEDC's President and CEO, Scott Darnell, described GPEDC's function as being to "allocate resources," "grow the economy," and see to "the economic development of Paducah and McCracken

County." [DN 50-1 at 13, 25 (Darnell Deposition).] GPEDC seeks to bring together the public and private sectors "to accomplish the goals of the community." [*Id.* at 13.]

In late 2014, Darnell decided that GPEDC needed to hire another employee, and, after presenting it to the board of directors, "moved forward" with the hiring process. [DN 50-1 at 52.] To aid GPEDC in its search, GPEDC entered into an agreement with Logan Development Group ("Logan Development") in January of 2015. [*Id.* at 53–55; DN 29-3 at 1–2 (Consulting Services Agreement)[1].] Pursuant to this agreement, Logan Development would recruit applicants for the position of Vice President for Special Projects at GPEDC. [DN 29-3 at 1.] After entering into the Agreement, Darnell met with Logan Development's CEO, Daniel Logan, to discuss a list of desired qualifications for applicants. [DN 50-1 at 56–57.] The result was a document titled "Recruitment Profile, Vice President, Special Projects." [DN 29-4 at 1– 5 (Recruitment Profile).] The Recruitment Profile listed several attributes under "Desired Job Experience," including "7+ years of proven experience in a corporate environment," a "[s]trong history of leadership," "[k]nowledge and understanding of business functions and principles," "[e]xperience working with grants and governmental programs," "[e]xecutive management experience," "[p]roject management experience," and "[e]conomic development experience." [*Id.* at 1.] Under "Education," the Recruitment Profile stated that a bachelor's degree was required, but that an advanced degree, training, and certifications were preferred. [*Id.* at 2.]

Around mid-January, 2015, Taylor learned of the job opening at GPEDC after seeing it on the evening news. [DN 50-3 at 44.] Taylor submitted his resume electronically to Logan on January 14. [*Id.* at 52–53.] Logan responded within fifteen to twenty minutes in an email in which he stated "Jeff, thank you for your interest. Please complete the attached written interview

---

[1] Though the Consulting Services Agreement is dated January 5, 2014, Darnell clarified in his deposition that the date of the Agreement should read January 5, 2015. [DN 50-1 at 55–56.]

form and return to me." [*Id.* at 53.] This form, titled the "Candidate Interview Questionnaire," asked respondents to provide additional information "[t]o help [Logan Development] further evaluate [their] qualifications." [DN 31-1 at 23 (Taylor Candidate Interview Questionnaire).] The Questionnaire asked applicants to explain, among other things, their educational and professional backgrounds, personal strengths, management experience, previous economic development projects, current employment packages (including salaries, bonuses, and benefits), and desired future employment packages. [*Id.* at 23–25.] In response to the question regarding employment packages, Taylor gave the following response:

> I am retired as of September 31st 2014. My last position paid a salary of $120,000 with health, medical, and retirement benefits and a yearend bonus that ranged from $13,000-$20,000. I was provided a company car, gas card and credit card for travel, entertaining clients and partners. I desire a benefit package that would come close to my previous benefits and exceed my previous salary. The ranges are negotiable.

[*Id.* at 25.]

Out of approximately eighteen to twenty applicants, Logan Development forwarded a total of five applicants' resumes and Questionnaires to Darnell for his consideration. [DN 50-1 at 60; DN 50-2 at 39–41 (Logan Deposition).] Of those applicants, GPEDC conducted phone interviews with three individuals and an in-person interview with one individual, William McDowell. [DN 50-1 at 61–62.] Taylor's resume and Questionnaire were not among those forwarded to Darnell. [DN 50-1 at 60; 50-2 at 41–42.] When asked why this was, Logan testified in his deposition that Darnell communicated to him that GPEDC wished to pay the new Vice President for Special Projects between $70,000 and $100,000, and therefore that Taylor's desire to "exceed his previous salary" of $120,000 meant he was out of GPEDC's price range. [DN 50-2 at 49–52.] During his deposition, Darnell testified that he never received Taylor's resume while the job search was ongoing and that he did not know why Logan did not forward Taylor's

application materials to GPEDC. [DN 50-1 at 60–61.] However, Darnell confirmed that GPEDC wished to pay the new Vice President no more than $85,000 to $90,000, plus a bonus. [*Id.* at 69.]

In a text exchange between Darnell and Logan on January 16, two days after Taylor emailed Logan his application and completed Questionnaire, Logan told Darnell "May have found a really strong candidate. Depends on salary and personality. Not sure what he makes yet but looks good on paper. Will let you know." [*Id.* at 72.] When asked whether that message was about Taylor, Logan responded "No," though he could not "recall which candidate it was." [*Id.* at 73.] Darnell responded to this text message with "Great, referred a young guy to you today. Very young, but great references. Had dinner with Mardie from Paducah bank and he said good things about you." [*Id.*]

On January 19, Logan sent Darnell and email that said "Really hate this candidate is so expensive. Think the background is right on the money." [*Id.* at 74.] Darnell responded the next day with "Yes, very good candidate, but too expensive unfortunately. Keep up the good work." [*Id.*] When asked whether this conversation pertained to Taylor, Logan again replied "No," though he did not "recall which candidate that was." [*Id.*] Logan further testified that he "never discussed" Taylor or Taylor's application with Darnell. [*Id.* at 76.]

When asked whether GPEDC was aware that Taylor had applied for the job, Darnell stated that he had "no recollection of that." [DN 50-1 at 62.] On January 22, 2015, Taylor sent an email to David Denton, a member of GPEDC's board of directors, notifying him that he applied for the Vice President for Special Projects position with GPEDC. [DN 50-1 at 123.] Denton replied that same day with "Good news!" [*Id.*] However, Darnell testified that he and Denton never discussed Taylor. [*Id.* at 63.] Darnell further testified that he never discussed any of the applicants with the GPEDC board of directors. [*Id.* at 62.]

McDowell, who GPEDC ultimately hired, is a white male in his late twenties. [DN 50-1 at 61.] McDowell graduated from college in May 2010 and worked at the Kentucky Cabinet for Economic Development from November 2012 until his application with GPEDC in 2015. [DN 50-2 at 116 (McDowell Resume).] In response to the same question regarding employment packages, McDowell gave the following response:

> Current Salary: $52,500
> Retirement:    401k, state pension
> Benefits:       Health Insurance
>
> Given my experience in economic development, management, and commercial real estate and the list of responsibilities for this position I would anticipate a salary around $100,000 plus benefits. This jobs [sic] would be a destination and an honor for me. This is not a stepping stone I'm looking to hop across. It would be a privilege to serve my community in this role.

[DN 50-1 at 128 (McDowell Candidate Interview Questionnaire).] Logan emailed Darnell about McDowell on February 6, saying that he had a "[g]reat talk" with McDowell and that "[h]e is going to re-work. Very open and receptive. We are good on compensation. He basically took some advice from someone on how to answer that question and they steered him wrong. No big deal. Really like him. Will get you his stuff when he gets it back to me." [DN 50-2 at 78.] When asked to elaborate on this email exchange, Logan testified that he thought there was a large gap between McDowell's current salary of $52,500 and his desired salary of $100,000. [*Id.* at 78–79.] Accordingly, Logan "brought it up to him," and McDowell "said he was willing to rework." [*Id.*] Upon his hire, GPEDC ultimately agreed to pay McDowell a salary of $70,000. [*Id.* at 81, 147; DN 50-1 at 69.]

When asked whether anyone "communicate[d] to [Taylor] that if he reworked his answer to [the salary question], he might have been a viable candidate for the position," Logan responded "No." [DN 50-2 at 79.] Logan explained that this was because, unlike Taylor,

McDowell's requested salary of $100,000 "was within the salary range" that GPEDC said it would pay, and that, had McDowell requested more than $100,000, "we wouldn't have had the conversation." [*Id.*]

Taylor did not interview with GPEDC, nor did he ever hear back from GPEDC after sending in his resume and Questionnaire. [DN 50-3 at 68–69.] However, Darnell repeatedly testified that Logan never forwarded Taylor's application materials to him and therefore that he never reviewed Taylor's application materials. [DN 50-1 at 60–64.] Taylor learned that GPEDC hired McDowell sometime in March, and initially did not think much of it. [DN 50-3 at 68–70.] However, Taylor ultimately discovered that, based on McDowell's college graduation date and his hire date with GPEDC, he did not have the desired seven years of experience qualification that was listed in the Recruitment Profile. [*Id.* at 69–70.]

Taylor brought suit against GPEDC, claiming that he was denied the opportunity to interview for the position of Vice President for Special Projects based on his race and age. [*See* DN 1.] GPEDC denies these allegations, arguing that Taylor was not qualified for the position, was never considered for the position, and therefore that GPEDC had a legitimate, nondiscriminatory reason for not interviewing Taylor for the position. [DN 29-1 at 16–17 (Memorandum in Support of GPEDC's Motion for Summary Judgment).] GPEDC also filed a Third Party Complaint against Logan Development, claiming that, should GPEDC be found liable on any of Taylor's claims, Logan Development is liable to GPEDC pursuant to an indemnity provision contained in the agreement between Logan Development and GPEDC. [*See* DN 22 (Third Party Complaint).]

STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

The moving party must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the nonmovant's claim or defense. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). Nor will mere speculation suffice to defeat a motion for summary judgment: "[t]he

mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

DISCUSSION

GPEDC has moved for summary judgment as to Taylor's §§ 1983 and 1981 claims. [*See* DN 29-1.] The Court will address each of these claims in turn.

I.   **Section 1983 Race and Age Discrimination**

Taylor alleges that GPEDC violated 42 U.S.C. § 1983 by discriminating against him on the basis of both his race and age. [DN 1 at 4.] "To state a claim for violation of 42 U.S.C. § 1983, the plaintiff must demonstrate that: (1) a person [or entity], (2) acting under color of state law, (3) deprived him of a federal right. *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (citing *Sperle v. Mich. Dep't of Corr.,* 297 F.3d 483, 490 (6th Cir. 2002)). Here, Taylor claims that GPEDC acted under color of state law to deprive him of his right to be free from race and age discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. [DN 1 at 4.] In its motion for summary judgment, GPEDC argues that Taylor's § 1983 claims fail as a matter of law because GPEDC is not a state actor, but a private corporation not acting under color of state law. [DN 29-1 at 12–14.]

 "The ultimate issue in determining whether a party is subject to liability under 42 U.S.C. § 1983 is whether the alleged infringement of federal rights is 'fairly attributable to the state.'" *Crowder v. Conlan*, 740 F.2d 447, 449 (6th Cir. 1984) (quoting *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982)). And "if the actions of [GPEDC] here were not state action, our

inquiry ends." *Id.* (citing *Rendell-Baker v. Kohn,* 457 U.S. 830, 838 (1982)). "The Supreme Court has established four tests for determining whether the challenged conduct may be fairly attributable to the State for purposes of a § 1983 claim. These are (1) the public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and (4) the entwinement test." *Vistein v. Am. Registry of Radiologic Technologists*, 342 F. App'x 113, 127 (6th Cir. 2009) (citing *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir. 1992); *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288, 298 (2001)).

In its Opinion denying GPEDC's motion to dismiss, the Court held that Taylor failed to demonstrate that the alleged infringement of his Fourteenth Amendment rights is fairly attributable to GPEDC under either the public function or state compulsion tests. [DN 9 (May 16, 2016 Memorandum Opinion).] However, the Court held that Taylor pled sufficient facts to warrant discovery on whether GPEDC's alleged involvement with state and local government satisfies the nexus test. [*Id.* at 8–9.] Moreover, though the Court did not mention the entwinement test at the motion to dismiss stage, it will likewise address that test here.[2] For the reasons that follow, the Court finds that Taylor has failed to demonstrate that GDPEC's actions are fairly attributable to the state under both the nexus and entwinement tests.

### a. Nexus Test

Under the nexus test, also known as the symbiotic relationship test, "a private party's conduct constitutes state action where 'there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated

---

[2] "Some cases in this circuit have only enumerated three tests for evaluating whether an action is fairly attributable to the state." *Marie v. Am. Red Cross*, 771 F.3d 344, 362 n.6 (6th Cir. 2014) (citing *Wilcher v. City of Akron,* 498 F.3d 516, 519 (6th Cir. 2007)). Indeed, this Court only mentioned three such tests in its Opinion denying GPEDC's motion to dismiss, [DN 9 at 6.] However, more recent decisions of the Sixth Circuit have included a fourth test, the entanglement test. *See Vistein*, 342 F. App'x at 127; *Marie*, 771 F.3d at 362–65. As such, the Court will likewise address that test here. Because the nexus test and the entwinement test are closely related, however, no additional discovery is necessary as to the fourth test.

as that of the state itself.'" *Marie v. Am. Red Cross*, 771 F.3d 344, 363 (6th Cir. 2014) (citing *Wilcher v. City of Akron,* 498 F.3d 516, 520 (6th Cir. 2007)). There is "no clear standard for identifying a 'sufficiently close nexus.'" *Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000). Instead, a "finding [of] state action in civil rights cases . . . 'can be determined only in the framework of the peculiar facts or circumstances present.'" *Id.* (quoting *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 726 (1961)). However, The Sixth Circuit and the Supreme Court have identified multiple "factors which are decidedly insufficient, by themselves, to justify a finding of a close nexus between the state and a private actor." *Id.*

First, "it is . . . well-established that state regulation, even when extensive, is not sufficient to justify a finding of a close nexus between the state and the regulated entity." *Id.* Second, "neither public funding nor private use of public property is enough to establish a close nexus between state and private actors." *Id.* Third, "[t]he minority presence of public officials on the board of a private entity does not render the entity a state actor; nor does the mere approval or acquiescence of the state in private activity." *Id.* at 831. Fourth, the "utilization of public services by private actors does not convert private action to state action." *Id.* Fifth, the fact that a private actor "confers an economic benefit on the [government] by operating . . . is insufficient to establish that [the private actor] is a state actor." *Id.*

Here, Taylor points to numerous facts which he argues establish a "sufficiently close nexus." Taylor asserts that GPEDC "is the beneficiary of annual contracts under which is it 'charged with the economic development of Paducah and McCracken County,'" [DN 50-1 at 21], that it "staffs the Paducah-McCracken County Industrial Development Authority and pays monthly bills for property it owns," [*id.* at 26–27], and that it helps negotiate deals on behalf of the City of Paducah which are subject to the Mayor and City Council's approval. [*id.* at 19–20,

32–33.] Additionally, Taylor argues that GPEDC "is subject to significant governmental control and receives government support without which it could not function." [DN 31 at 14.] For example, the 2014-2015 budget, the 2015-2016 budget, and the 2016-2017 budget each projected contributions of $250,000 from the City, $250,000 from the County, $50,000 from City Entre Paducah, and between $50,000 to $70,000 from County Entre Paducah. [DN 50-1 at 106–110.] Taylor also argues that GPEDC receives "additional funding from Paducah Power, Paducah Water, PACRO, the Paducah-McCracken County Joint Sewer Agency, and the Paducah-McCracken County Riverport." [DN 31 at 14–15.] Taylor further alleges that GPEDC purchased from the City a piece of property at 401 Kentucky Avenue valued between $500,000 to $1 million for only $1. [DN 31-3 at 3 (Declaration of Chad Chancellor).] Further, Taylor claims that the "County forgave over $500,000 of debt associated with real property" that GPEDC "owns in West McCracken County for the purpose of creating a river, industrial park." [*Id.*]

Taylor also points out that "representatives of governmental bodies and entities controlled entirely by government funding . . . hold ten of thirty-two seats" on GPEDC's board of directors. [DN 31 at 15.] These include, for example, the City Mayor and the County Judge Executive. [DN 50-1 at 104–105.] Also on the board are the City Manager and the County Deputy Judge Executive, although they are non-voting members. [*Id.* at 104.] Two other board members include the Presidents of Murray State University and Western Kentucky Community and Technical College. [*Id.* at 104–105.]

However, none of these facts are enough to meet Taylor's burden under the nexus test. As an initial matter, the Sixth Circuit has made clear that the receipt of public funding by a private entity is not sufficient to establish a sufficiently close nexus for § 1983 purposes. *Lansing*, 202 F.3d at 830, 832 ("[T]he Supreme Court and th[e] [Sixth] [C]ircuit have held that

even in cases where private entities received virtually all of their funding from the state, that fact alone was insufficient to establish a close nexus between the state and the activity of the private entity.") Moreover, it is insufficient that a minority of GPEDC's board of directors, here, less than one third, are public officials or public employees. *Id.* at 831. Additionally, the fact that GPEDC has contractual relationships with the City and works to provide the City and County with economic benefits is also insufficient. *Id.* ("[T]he fact that [a private entity] confers an economic benefit on the city . . . is insufficient to establish that [the private entity] is a state actor. A great many private entities confer economic benefits on the state without their activities being imputed to the state.")

What's more, "it is important to note that this test evaluates whether 'there is a sufficiently close nexus between the state and *the challenged action.*'" *Marie*, 771 F.3d at 363 (quoting *Wilcher,* 498 F.3d at 520). *See also Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992) ("[I]t must be demonstrated that the state is intimately involved in the challenged private conduct in order for that conduct to be attributed to the state for purposes of section 1983.") Here, none of the alleged connections between GPEDC and the City and County are alleged to relate in any way to the hiring of the Vice President for Special Projects, the challenged action in this case.

There is no evidence that government officials or entities had *any* role in GPEDC's actions in choosing a candidate for this position. *See Lansing*, 202 F.3d at 833 ("[T]here is no evidence that Memphis in May's board of directors or its executive committee had anything to do with the [challenged] decision to ask Lansing to move outside the barricade . . . ." Rather, Darnell testified that he, "as president/CEO charged with the daily tasks of the . . . organization . . . made the decision we needed to hire somebody." [DN 50-1 at 52.] He then presented this to

the board and "moved forward." [*Id.*] However, Darnell stated that neither "the board [n]or any

of the board members express[ed] to [him] any requirements" or qualifications they desired for

applicants to the position of Vice President for Special Projects. [*Id.* at 58.] Moreover, Darnell

stated that he never discussed any of the job applicants, nor their qualifications, with any

members of the board of directors. [*Id.* at 62.] In fact, he testified that he only ever discussed the

applicants with Nora Rikel, the CFO of GPEDC. [DN 50-1 at 11–12, 62.] Accordingly, Taylor

has failed to demonstrate, as the nexus test requires, that the City or County were "intimately

involved in the challenged private conduct [of GPEDC] in order for that conduct to be attributed

to the state for purposes of section 1983." *Wolotsky*, 960 F.2d at 1335.

### b.  Entwinement Test

To satisfy the entwinement test, Taylor must establish that GPEDC is "is 'entwined with

governmental policies' or that the government is 'entwined in [GPEDC's] management or

control.'" *Marie*, 771 F.3d at 363–64 (quoting *Vistein,* 342 F. App'x at 128). The Sixth Circuit

has identified

> [t]he crucial inquiry under the entwinement test [a]s whether the "nominally
> private character" of the private entity "is overborne by the pervasive
> entwinement of public institutions and public officials in its composition and
> workings [such that] there is no substantial reason to claim unfairness in applying
> constitutional standards to it."

*Id.* (quoting *Vistein,* 342 F. App'x at 128). Taylor argues that the "entanglements are extensive

and reciprocal – Defendant acts on behalf of local governments and receives the benefits of

government support, encouragement, and direction." [DN 31 at 15.]

Yet, as the Court stated above, there is insufficient evidence that public officials and

public institutions are "pervasively entwine[d] . . . in [GPEDC's] composition and workings."

*Marie*, 771 F.3d at 363–64 (quoting *Vistein,* 342 F. App'x at 128). Only ten of GPEDC's thirty-

two board members are either public officials or affiliated with public institutions. Moreover, though GPEDC receives significant funding from local governments, this funding accounts for less than half of GPEDC's total projected income. [*See* DN 50-1 at 106–109.] Finally, the contractual relationships between GPEDC and the City are insufficient to establish the requisite "pervasive entwinement." The mere "fact that a public entity . . . act[s] in compliance with a private entity's recommendations," *Vistein*, 342 F. App'x at 128, or that a private entity and a public entity have a highly cooperative relationship, *Marie*, 771 F.3d at 364, are insufficient to satisfy the entwinement test. Contractual relationships between public and private entities, such as lease agreements and limited profit-sharing agreements, are insufficient to render the actions of a private entity attributable to the state. *Lansing*, 202 F.3d at 832. In sum, because Taylor has failed to demonstrate that GPEDC acted under the color of state law, GPEDC is entitled to judgment as a matter of law as to Taylor's § 1983 race and age discrimination claims.

## II. Section 1981 Race Discrimination

Taylor also alleges that GPEDC violated 42 U.S.C. § 1981 when it denied him the opportunity to contract for employment on the basis of his race. Section 1981 "prohibits intentional race discrimination in the making and enforcing of contracts." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006). The statute defines "make and enforce contracts" as "includ[ing] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b). "Such a contractual relationship need not already exist, because § 1981 protects the would-be contractor along with those who already have made contracts." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). And unlike § 1983, § 1981 applies to both public and private actors. § 1981(c); *Amini*, 440 F.3d at 358.

Courts analyze § 1981 claims under the "same analytical framework" as Title VII claims. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000) ("The elements of *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981.")). *See also Tartt v. Wilson Cty., Tennessee*, 592 F. App'x 441, 444 (6th Cir. 2014) ("The elements of a prima facie case and the burden-shifting framework followed by courts in adjudicating [§§ 1981 and 1983] claims are the same as those in cases under Title VII.")

"Under this framework, a plaintiff can prove racial discrimination by proffering either direct evidence or circumstantial evidence." *Tennial*, 840 F.3d at 302 (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003)). To make out a prima facie case using circumstantial evidence, as Taylor seeks to do here, he must do so "under a slightly modified version of the burden-shifting approach adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Overall v. RadioShack Corp.*, 202 F. App'x 865, 868 (6th Cir. 2006). Specifically, to establish his prima facie case, Taylor "must show that (1) he is a member of a protected class, (2) he applied for and did not receive the job at issue, (3) he was qualified for the job, and (4) similarly situated persons not in his class received the job for which he applied." *Id.* (citing *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003)).[3]

---

[3] GPEDC argues in its motion that Taylor must prove, as part of his prima facie case, that he applied and was considered for the position of Vice President for Special Projects. [DN 29-1 at 15–17.] The Court is aware of one Sixth Circuit case in which the court included, as part of the plaintiff's prima facie case for a failure to hire claim, the requirement that the plaintiff applied and "was considered" for the job in question. *See Pucci v. Basf Corp.*, 55 F. App'x 243, 245 (6th Cir. 2002). However, apart from that case, "the vast majority of cases in which the Sixth Circuit . . . has included 'considered for' as part of the plaintiffs' *prima facie* case involve failure to promote." *Barr v. Smith & Wollensky Rest. Grp.*, No. 2:04-CV-01131, 2006 WL 3391156, at *4 (S.D. Ohio Nov. 22, 2006) (citing *Campbell v. Univ. of Akron*, 211 F. App'x 333, 347 (6th Cir. 2006); *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711,

If Taylor can establish these elements, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employ[er]'s [decision].'" *O'Donnell v. City of Cleveland*, 838 F.3d 718, 726–27 (6th Cir. 2016), *cert. denied sub nom. O'Donnell v. City of Cleveland, Ohio,* 137 S. Ct. 1206 (2017) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If GPEDC articulates such a reason, "then the burden shifts back to [Taylor] to demonstrate that the reason is a pretext for discrimination." *Id.* (citing *Burdine*, 450 U.S. at 253). Taylor can demonstrate pretext "by showing that [GPEDC's] reason (1) had no basis in fact; (2) did not actually motivate its decision; or (3) was insufficient to justify its decision." *Spokojny v. Hampton*, 589 F. App'x 774, 778–79 (6th Cir. 2014) (citing *Carter v. Univ. of Toledo,* 349 F.3d 269, 274 (6th Cir. 2003)).

### a. Prima Facie Case

The parties do not dispute that Taylor, as an African American, is a member of a protected class. Nor do they dispute that he applied for and did not receive the position of Vice President for Special Projects with GPEDC. Finally, GPEDC does not refute in its motion or its reply that McDowell was a similarly-situated white male outside of Taylor's protected class who did receive the job. [*See* DN 29-1; DN 33.]

However, GPEDC asserts that Taylor fails to make out a prima facie case for failure to hire race discrimination because Taylor was not "qualified" for the position of Vice President for

---

719 (6th Cir. 2006); *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)). Moreover, since *Pucci*, other Sixth Circuit cases addressing failure to hire claims have *not* included the "considered for" requirement in the elements of a plaintiff's prima facie case. *See Overall*, 202 F. App'x at 868. Accordingly, the Court will not require Taylor to demonstrate, as part of his prima facie case, that he was "considered for" the position of Vice President for Special Projects. However, the Court will address this issue in its discussion of pretext.

Special Projects.[4] [DN 29-1 at 16.] Specifically, GPEDC argues that Taylor's "salary and benefit requirements did not fall within GPEDC's acceptable range." [*Id.*] The Court finds this argument unpersuasive. The Sixth Circuit has explained that, "[i]n considering whether a plaintiff is qualified and thus meets the second prong of h[is] *prima facie* burden, the case law is clear that '[a] court must evaluate whether a plaintiff established his qualifications independent of the employer's proffered nondiscriminatory reasons for discharge [or failure to hire] ... [and] be careful not to conflate the distinct stages of the *McDonnell Douglas* test.'" *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 242 (6th Cir. 2005) (quoting *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002)). Though GPEDC appears to argue that a qualification for the position of Vice President for Special Projects was that an applicant sought a salary between $70,000 and $100,000, it appears that this argument does precisely what the Sixth Circuit has cautioned against: conflating an applicant's qualifications with an employer's proffered legitimate non-discriminatory reason for choosing not hire that applicant.

"To establish that [he] is qualified for the position, a Title VII plaintiff need only show that [he] satisfied an employer's 'objective' qualifications." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) (quoting *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 575–76 (6th Cir. 2003) (en banc)). In detail,

> [t]he prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

---

[4] Though GPEDC also argues that Taylor fails to make out a prima facie case because he was not "considered for" the position, the Court will address this argument in its discussion of pretext rather than as an element of Taylor's prima facie case. *See* footnote 3, *supra*.

*Wexler*, 317 F.3d at 575–76. The Recruitment Profile devised by Logan and Darnell included such experience, skills, and qualifications as "7+ years of proven experience in a corporate environment," a "[s]trong history of leadership," "[k]nowledge and understanding of business functions and principles," "[e]xperience working with grants and governmental programs," "[e]xecutive management experience," "[p]roject management experience," and "[e]conomic development experience." [DN 29-4 at 1.] Under "Education," the Recruitment Profile stated that a bachelor's degree was required, but that an advanced degree, training, and certifications were preferred. [*Id.* at 2.]

Taylor holds both a bachelor's and master's degree, has a certification in Basic Economic Development, spent two years at the Economic Development Institute at the University of Oklahoma, and is certified as an Economic Development Finance Professional by the National Development Council. [DN 31-5 at 32.] Moreover, he was employed at the TVA for over thirty years, during which time he held positions directly related to and involving economic development, including the positions of Project Manager and Senior Project Manager. [*Id.*] He has experience in working with elected officials and economic development partners, managing loan funds and grant programs, providing technical assistance, coordinating with local communities, and generating economic projects. [*See id.*; *see* DN 50-3 at 26– 45.] Based on these objective qualifications, and viewing the record in the light most favorable to Taylor, he has more than met his burden of establishing that he was qualified for the position of Vice President for Special Projects. And because GPEDC does not dispute the satisfaction of the other three elements of Taylor's prima facie case, the Court finds that Taylor has successfully made out a prima facie case for failure to hire race discrimination.

### b. Legitimate Non-Discriminatory Reason

Now, the burden now shifts to GPEDC to articulate a legitimate, non-discriminatory reason for its decision not to hire Taylor. *O'Donnell*, 838 F.3d at 726–27. "This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Upshaw*, 576 F.3d at 585.

GPEDC claims, first, that Logan and GPEDC were unaware that Taylor was African American, and second, that GPEDC did not consider Taylor for the position because it never knew that he applied for it. [DN 29-1 at 17.] Though the Court does not find that Logan and GPEDC's lack of knowledge regarding Taylor's race constitutes a "reason" why he was not hired (though it may serve to rebut a finding of pretext), GPEDC's alleged lack of knowledge of the existence of Taylor's application does. Accordingly, GPEDC has provided a legitimate, non-discriminatory reason for its failure to hire Taylor, and the burden now shifts back to Taylor to demonstrate that GPEDC's proffered reason is a pretext for discrimination.

### c. Pretext

Taylor can establish pretext in one of three ways. He can show that GPEDC's proffered reason 1) has no basis in fact, 2) did not truly motivate its decision, or 3) is insufficient to justify its decision. *Spokojny*, 589 F. App'x at 778–79 (citing *Carter*, 349 F.3d at 274). Here, Taylor argues there is evidence to suggest that GPEDC *did* become aware of his application. [DN 31 at 17–19.] First, Taylor points to the text and email exchanges that occurred between Logan and Darnell on January 16, January 19, and January 20. [*Id.*] Second, Taylor argues that GPEDC was aware of his application as a result of the email he sent to Denton, a member of GPEDC's board of directors, on January 22, 2015. [DN 31 at 8.] In that email, Taylor informed Denton "[j]ust as

FYI" that he applied for the Vice President for Special Projects position with GPEDC, and Denton replied later that day with "Good news!" [DN 50-1 at 123.]

On January 16, Logan sent a text message to Darnell stating that he "[m]ay have found a really strong candidate. Depends on salary and personality. Not sure what he makes yet but looks great on paper. Will let you know." [DN 50-2 at 141 (Text Messages).] Though Logan did not recall to which candidate this text message referred, he testified that it was not about Taylor. [*Id.* at 73.] On January 19, Logan emailed Darnell and said "Really hate this candidate is so expensive. Think that the background is right on the money." [DN 50-2 at 142 (Email Exchange between Logan and Darnell).] Again, stated that this email did not refer to Taylor, though he could not "recall which candidate that was." [*Id.* at 74.] Darnell replied to that email on January 20 with "Yes, very good candidate, but too expensive unfortunately . . . Keep up the good work." [*Id.*] Logan testified that, in between the January 16 text messages and the January 19 and 20 emails, he must have forwarded Darnell some information about this "too expensive candidate." [DN 50-2 at 74–75.] In response to the question whether there was "[a]ny reason [he] would have sent [Darnell an email about] this too expensive candidate but not Jeff Taylor," Logan responded "Uh, no, it was just simply showing him the background of a top tier candidate and wanted to confirm what he had already expressed in salary." [*Id.* at 75.] According to Taylor, this constitutes "evidence from which a jury could conclude that Defendant was aware of and rejected his application." [DN 31 at 17.]

GPEDC argues that the text and email messages did not refer to Taylor, but to another candidate. Indeed, Logan testified in his deposition that the text and email messages did not refer to Taylor. [DN 50-2 at 72–76.] Additionally, Darnell testified that he never "review[ed] Mr. Taylor's application materials." [DN 50-1 at 63.] GPEDC further states that, as Logan already

21

had Taylor's salary information on January 14, Taylor could not have been the candidate that Logan and Darnell discussed on January 16, 19, and 20, since Logan stated on January 16 that he did not yet know what salary that candidate made. [DN 33 at 11–13; DN 50-2 at 141.]

In response, however, Taylor asserts that

> [i]t is implausible that Mr. Logan claimed to reject Mr. Taylor's application because of his perceived salary demand then, in the same time window, sent Mr. Darnell application materials about a different candidate, corresponded with Mr. Darnell about rejecting that other candidate for the same reason, but could not identify any of the other candidates about whom he supposedly was speaking.

[DN 31 at 18.] Whether or not GPEDC's argument is "implausible," however, is for a jury to decide. The Court agrees with Taylor that the text and email messages between Logan and Darnell, at the very least, create a jury question as to whether GPEDC was aware of Taylor's application. While Logan repeatedly denied that the correspondence between him and Darnell was about Taylor, he could not point to *any* other candidate to which the communications allegedly referred, which arguably raises credibility issues as to the veracity of this testimony.

Similarly, the Court finds that Taylor's email to Denton, a member of GPEDC's board of directors, may also tend to suggest that GPEDC was on notice that Taylor was interested in the position of Vice President for Special Projects. Though Darnell testified in his deposition that he did not "discuss the applicants or their qualifications" with the board of directors and that Denton "never contacted" him about Taylor's email, [DN 50-1 at 62–63], the Court again finds that the credibility of these statements are best resolved by a trier of fact.

True, the Sixth Circuit has explained that an employer's lack of knowledge that an applicant is interested in a given position negates a finding of pretext. Rather, "[a]s a matter of common sense, the only way that [an employer's] decision [not to hire an applicant] could be evidence of racial discrimination is if [the employer] had reason to know that [the plaintiff] was

actually interested in the . . . position." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 704 (6th Cir. 2007). Therefore, if a plaintiff "has not cited anything in the record indicating that [the employer] was on notice that [plaintiff] was interested in the position until well after . . . the position had been filled," the plaintiff cannot establish pretext. *Id.* Here, however, Taylor has pointed to ambiguity and credibility issues relating to the text and email exchanges between Logan and Darnell and the email exchange between Taylor and Denton sufficient to create an issue of fact as to whether GPEDC "had reason to know that [Taylor] was actually interested in the . . . position." *Clay*, 501 F.3d at 704.

Though the Court finds that this matter presents an exceedingly close call, it nonetheless finds at this stage of the proceedings that Taylor has provided sufficient evidence to create a genuine issue of material fact as to whether GPEDC's proffered legitimate, nondiscriminatory reason for not hiring Taylor is a pretext for discrimination. The Court believes that it will be in a better position to evaluate the probative effect of the proof after it has heard all of the evidence. Accordingly, GPEDC's motion for summary judgment as to Taylor's § 1981 claim is denied.

## III.    GPEDC's Motion for Leave to Amend Third Party Complaint

GPEDC has also moved for leave to amend its third party complaint against Logan Development "to unequivocally reference and invoke the indemnification clause of the "Agreement" as a specific ground of Logan's liability additional and supplemental to those grounds originally asserted." [DN 34 at 1–2.] Specifically, GPEDC seeks to reference a clause in its Consulting Services Agreement with Logan Development which states that "Contractor agrees to indemnify and hold client harmless from any and all claims, liabilities, losses and expenses arising out of, or resulting from, any and all activities conducted by Contractor. [DN

34-2 at 2 (Consulting Services Agreement.] As referenced in the Agreement, Logan Development is the "Contractor" and GPEDC is the "client." [*Id.* at 1.]

In GPEDC's third party complaint against Logan Development, GPEDC claimed that

In the event G.P.E.D.C. is found to be liable to Plaintiff Taylor on his underlying claim against it, Logan will be liable to G.P.E.D.C. for all or part of Taylor's claim since Logan had Taylor's resume and knew of his interest in the position of Executive Vice President. If any unlawful or actionable age or race discrimination was perpetrated against Taylor, as alleged in his Complaint, such was done by Logan, not G.P.E.D.C., and consequently G.P.E.D.C. is entitled to indemnification and/or contribution from Logan and/or G.P.E.D.C. is entitled to an apportionment or allocation of fault as between it and Logan.

[DN 22 at 3.] However, in its Third Party Complaint, GPEDC did not mention the *contractual* indemnity provision contained in the Agreement. In the instant motion, GPEDC claims that this omission was inadvertent, and therefore seeks to amend its Complaint to make reference to the contractual provision. [*See* DN 32.]

Federal Rule of Civil Procedure 15 entitles any party to "amend its pleading once as a matter of course" before being served with a responsive pleading, Fed. R. Civ. P. 15(a)(1), and in all other cases, allows a party to amend either "with the opposing party's written consent or the court's leave." *Id.* at (a)(2). The Rule further states that "court[s] should freely give leave when justice so requires." *Id.* In determining whether the interests of justice support a grant of leave to amend, courts consider several factors, including "undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, or futility of the amendment." *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005) (citing *Coe v. Bell*, 161 F.3d 320, 341–42 (6th Cir. 1998)); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). "The grant or denial of leave to amend is within the discretion of the trial court, and review is for abuse of

discretion." *Sec. Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1001, 1008 (6th Cir. 1995) (citing *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir.1983)).

The Sixth Circuit has explained that "[d]elay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself to disallow an amendment of a pleading." *Moore v. City of Paducah*, 790 F.2d 557, 561 (6th Cir. 1986). However, "[w]hen amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier." *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 459 (6th Cir. 2001) (citing *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)). GPEDC filed its Third Party Complaint against Logan Development on October 28, 2016. [*See* DN 22.] GPEDC filed the instant motion to amend on May 10, 2017. [*See* DN 34.] The trial in this case is set for July 24, 2017. [*See* DN 14 (Scheduling Order).]

In its motion for leave to amend, GPEDC claims that its failure to specifically reference the contractual indemnity provision in its Third Party Complaint was inadvertent and that it would not prejudice Logan Development to allow the amendment. [DN 34 at 1–2.] In response, however, Logan Development asserts that the proposed amendment, which comes after the discovery deadline and the dispositive motions deadline in this case, [DN 14], would "severely prejudice" it. [DN 36 at 2.] Specifically, Logan Development points out that common law indemnity, which it initially believed was the only claim GPEDC asserted against it, only arises in the event that liability is actually found. *See Am. Premier Ins. Co. v. McBride*, 159 S.W.3d 342, 345–46 (Ky. Ct. App. 2004) ("Under Kentucky law, there is no common law indemnity without liability.") The contractual indemnity provision contained in the Agreement between Logan Development and GPEDC, however, is broader. It extends not only to claims and liabilities, but also to "losses and expenses arising out of, or resulting from, *any and all* activities

conducted by" Logan Development. [DN 34-2 at 2 (emphasis added).] Logan Development asserts that it "took a very passive approach in defending" against GPEDC's claim for common law indemnity because "it agreed with G.P.E.D.C. that [Taylor's] claims for employment discrimination were extremely weak. In other words, it made no sense for Logan to spend the resources necessary to mount an aggressive defense, since it could only be held liable in the event that G.P.E.D.C. was found liable." [*Id.*]

In contrast, Logan Development argues that "[a] claim of contractual indemnity necessarily turns on the language contained in the contract and the facts and circumstances surrounding the formation of the contract. Logan [Development] chose not to conduct discovery into those issues because they were never asserted in the Third Party Complaint." [*Id.*] Logan Development asserts that, had it known GPEDC would pursue contractual indemnity, it "would have conducted the necessary discovery and likely filed its own motion for summary judgment on the contractual indemnity claim." [*Id.*] However, Logan Development does not explain with any specificity what kind of new discovery it would require to defend against GPEDC's claim of contractual indemnity. It makes no contention that it was unaware of the contractual indemnity provision in the Agreement between it and GPEDC. Moreover, Logan Development's CEO testified in his deposition that he *was* aware of the contractual indemnity provision and that his "understanding of that provision is that it protects my clients from any illegal or wrongdoing on my behalf." [DN 50-2 at 29.]

Though Logan Development claims that it would have defended the case differently had GPEDC asserted its contractual indemnity claim earlier, it fails to provide the Court with specific examples. Bare assertions that additional discovery is needed, without accompanying explanation, is insufficient. Without more, the Court simply cannot discern any prejudice Logan

Development would suffer in this case. Accordingly, GPEDC's Motion for Leave to Amend its Third Party Complaint is granted.

CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** that GPEDC's Motion for Summary Judgment, [DN 29], is **GRANTED IN PART** as to Taylor's § 1983 race and age discrimination claims **AND DENIED IN PART** as to Taylor's § 1981 claim. GPEDC's Motion for Leave to Amend Third Party Complaint, [DN 34], is **GRANTED**. The Clerk is directed to docket the Amended Third Party Complaint filed at [DN 34-1.]

Date:

cc:      Counsel